[No. 31790.   Department Two.   December 20, 1951.]

MRS. DAVID GREENBERG, as *Executrix*, *Appellant*, v. MANGANESE PRODUCTS, INC., *et al.*, *Respondents*, LYNWOOD FIX, *as Receiver*, *Respondent and Cross-appellant*.[1]

[1] Reported in 238 P. (2d) 1194.

*Army Seijas* and *Solie M. Ringold,* for appellant.

*Chadwick, Chadwick ·& Mills* and *Robert L. Fletcher,* for respondent and cross-appellant.

HILL, J.—Two questions are presented on this appeal: (1) Is a chattel mortgage filed within ten days of its delivery to the mortgagee but more than ten days subsequent to its signing and acknowledgment, filed within ten days of its execution within the purview of Rem. Supp. 1943, § 3780 [P.P.C. § 186-3]? (2) Is corporate stock belonging to the promoters of a corporation and held by one of them in a discretionary trust for the benefit of the corporation and its stockholders, when given as a bonus to an individual who loans money to the corporation at a legal rate of interest, such a consideration for the loaning of the money as will make the transaction usurious? We think these questions can be answered without a lengthy recitation of the facts and circumstances.

This is an action against Manganese Products, Inc., on its promissory note for $142,300.65, and to foreclose real-estate and chattel mortgages given to secure the note. The trial court held that the loan contract was usurious and allowed recovery of only $55,746.58; ordered foreclosure of the mortgage on the real estate but held that the chattel mortgage was void as to creditors and the receiver of the corporation. The plaintiff appealed.

▪ The insistence of the appellant that a chattel mortgage is not executed, within the purview of Rem. Supp. 1943, § 3780, until it is delivered to the mortgagee, finds no support in the statute itself, which, so far as here material, reads as follows:

"(a) A mortgage of personal property is void as against all creditors of the mortgagor, both existing and subsequent, whether or not they have or claim a lien upon such property, and against all subsequent purchasers, pledgees, and mortgagees and encumbrancers for value and in good faith, . . . *unless it is acknowledged and filed within ten days from the time of the execution thereof* in the office of the

County Auditor of the county in which the mortgaged property is situated as provided by law. . . . " (Italics ours.)

That the statute contemplates that acknowledgment will follow the execution of a chattel mortgage, cannot be gainsaid. "Execution" is here clearly used in the somewhat restricted sense of the signing of the instrument. We have a chattel mortgage signed and acknowledged October 5, 1949, which was clearly the date of its execution within the purview of the present statute. It was not delivered to the mortgagee until October 18, 1949, and was filed in the county auditor's office October 20, 1949. We are in accord with the trial judge in his determination that the chattel mortgage was void as to creditors and as to the receiver appointed for the corporate mortgagor, because it was not filed within ten days of its execution.

The appellant relies upon our holding in *Fenby v. Hunt* (1909), 53 Wash. 127, 101 Pac. 492, that a chattel mortgage is not executed until delivered. We were there construing § 2 of chapter 98, Laws of 1899, p. 158, and not the statute we have quoted *supra*. (The italicized language in our present statute was first used in 1915. See Laws of 1915, chapter 96, p. 277.) Prior to the 1899 act, all chattel mortgages had to be recorded, and that act provided for the first time for filing as distinguished from recording. Without discussion of the requisites to the validity of a chattel mortgage, § 2 of that act provided:

"Every such instrument [chattel mortgage] within ten days from the time of the execution thereof shall be filed in the office of the county auditor of the county in which the mortgaged property is situated. . . ."

In the *Fenby* case, *supra*, we properly construed the word "execution" as used in the 1899 act, to import delivery; it cannot be so construed in the statute now before us.

In consideration of the second question, the briefs discuss who can raise the defense of usury, and when and how it must be done. We find it unnecessary to discuss procedural issues, because we hold that on the uncontroverted facts the contract between Eddie Miller (whose executrix

is the plaintiff and appellant here) and Manganese Products, Inc., was not tainted with usury.

It is conceded that the corporation neither gave nor promised Miller any consideration other than five per cent interest for his loans of one hundred thousand dollars on January 2, 1948, fifteen thousand dollars on December 15, 1948, ten thousand dollars on January 10, 1949, and ten thousand dollars on October 5, 1949. These loans, with unpaid interest to October 5, 1949, made up the indebtedness of $142,300.65 evidenced by the note on which the executrix sues in this action. If there was any other consideration for the one-hundred-thousand-dollar loan, it was twenty-five thousand shares of the corporation stock transferred to Miller by John Allen, as trustee, December 29, 1947, some four days before the loan was made. (Miller already owned four thousand shares of the corporation stock.)

The rule is that a bonus given or paid by a stranger to a contract of loan for his own purposes or reasons, to induce the making of such contract by the lender, does not make the contract usurious. The reasons for this rule are best stated in *McArthur v. Schenck*, 31 Wis. 673, and *Rospigliosi v. Glenallen Mining Co.*, 69 Utah 41, 252 Pac. 276.

In *Winsor v. Commonwealth Coal Co.*, 63 Wash. 62, 114 Pac. 908, it was argued that the giving of stock by three stockholders to the parties who had advanced money to the corporation constituted usury. Our answer was:

"We think there was no usury in this. The stock given out actually belonged to Bates, Peer & Peterson at the time. They certainly could dispose of it as they saw fit."

That statement, while unnecessary to the decision, is consistent with the general rule as we have stated it.

However, it is urged by the respondents here that, since the stock given to Miller was part of one hundred fifty thousand shares of stock transferred by the promoters (who owned one million shares) to the president of the company, John Allen, as trustee, the entire one hundred fifty thousand shares were the corpus of a trust of which the corporation was the beneficiary, and, therefore, the transfer of part of

that stock to Miller reduced the resources of the corporation. They state in their brief, "Property which was beneficially owned by the corporation was actually transferred to the lender as an additional inducement." .

We cannot follow respondents in their concept of the interest which the corporation had in the stock in question. The only evidence as to the purpose for which Allen held the one hundred fifty thousand shares, twenty-five thousand of which he gave to Miller, was that of Allen himself:

"Q. And it was held by you as trustee to use wherever you deemed it possible to benefit the corporation? A. That is right. Q. In other words, if you could use it as an inducement for somebody to render services to the corporation, you could transfer some of that 150,000 without going to your associates? A. That is right. Q. You didn't have to go to any of the directors? The corporation had nothing to do with that? A. No. That is right. I would, of course, be in the position that I would have to justify my stand with my associates. Q. But you were acting on behalf of your associates who were the promoters of the corporation with respect to that 150,000 shares of stock? A. I would say that is right. Q. Then you issued 25,000 of those shares to Eddie Miller? A. That is right. Q. Deeming that it would be to the benefit of the corporation to obtain $100,000 cash? A. That is right. . . .

"Q. And you deemed it to be to your personal benefit, as well, to obtain money for the corporation, did you not? A. Certainly. Anything that would benefit the corporation would benefit me personally. Q. You and your associates? A. That is right. Q. And that was the reason that you issued the 25,000 shares of stock to him generally? A. Yes, generally, because we were all stockholders in the company.

. . .
"Q. . . . As I understand, there was no written agreement of trust between you and your associates? A. No. Q. But you were acting where you thought it was for their benefit?. A. That is right. . . . Q. In speaking of the benefit for which you as trustee held that stock, will you clear that up a little bit and tell us whether or not it was being held for the use and benefit of the corporation or of your particular associates? A. It was the corporation. Q. And in saying that it was beneficial to your associates, in what capacity were you speaking of them? As shareholders

or— . A. In proportion to the amount of stock that everyone held. . . .

"Q. There were some fourteen hundred stockholders who paid cash for stock? A. That is right. Q. This trust was for their benefit as well? A. Certainly. Q. Their investment represented approximately a million dollars in cold, hard cash? A. Yes, that is right. Q. Did you consider that this trust was for the benefit then of the small stockholders, as different from the founders? A. Not as different from the founders. I looked at it that the stock was for the benefit of all stockholders, small and large alike, proportionately."

■ This stock was in no sense a resource that could be used by the corporation. There was no way in which to compel its use for the corporate benefit. It was, as we interpret the testimony, for use by Allen in furtherance of the best interests of the corporation, the promoters, and other stockholders. The manner of its use was entirely in the discretion of Allen, and the exercise of that discretion was subject to no control by the beneficiaries except to prevent an abuse of his discretion. *Hanford v. Clancy,* 87 N. H. 458, 183 Atl. 271; 1 Restatement, Law of Trusts 479, § 187. It is our view that, if Allen gave Miller a bonus of twenty-five thousand shares of stock to induce a loan of one hundred thousand dollars to the corporation, he was doing exactly the sort of thing it was contemplated that the stock would be used for. The stockholders who had made the stock available expected and hoped, as owners of large blocks of stock, to receive personal benefit from any loan made to the corporation.

The intervener-respondent parted with no portion of his stock to secure the loan from Miller, and no stock was taken from the treasury of the corporation. There is no evidence to show that the corporation was a party to any agreement by which a stock bonus was paid; it had no such interest in the one hundred fifty thousand shares standing in the name of Allen, as trustee, as would enable it to say that it paid any part of the bonus or that its assets were in any way depleted thereby. The defense of usury was not established.

There being no usury, the cross-appeal as to the proper application of Rem. Rev. Stat., § 7304 [P.P.C. § 677-11], is moot.

Summarizing, we specifically affirm the trial court in its holding that the chattel mortgage sought to be foreclosed is void as against all creditors of Manganese Products, Inc., and as against its receiver; in fact, we affirm the entire judgment except as to its amount. The trial court entered a judgment for $55,746.58, on the theory that the loan contract was usurious and that Rem. Rev. Stat., § 7304, applied. In so doing, the trial judge stated that on the issue of usury the case was "closer than the next minute." We conclude on that close question, and for the reasons given, that the loan was not tainted with usury and that Mr. Miller's executrix is entitled to recover the amount of the note sued on, to wit, $142,300.65, together with interest thereon at five per cent per annum from October 5, 1949, until the date of the corrected judgment and decree to be entered by the superior court in conformity with this opinion.

The appellant, having prevailed on the principal issue on this appeal, will recover her costs.

GRADY, HAMLEY, FINLEY, and OLSON, JJ., concur.